2026 IL App (1st) 242206-U

FIRST DIVISION
May 4, 2026

No. 1-24-2206

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| SHAUNCE CARROLL, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 24 L 50503 |
| | ) | |
| ILLINOIS DEPARTMENT OF EMPLOYMENT | ) | |
| SECURITY; DIRECTOR, ILLINOIS | ) | |
| DEPARTMENT OF EMPLOYMENT | ) | |
| SECURITY; ILLINOIS DEPARTMENT OF | ) | |
| EMPLOYMENT SECURITY BOARD OF | ) | |
| REVIEW; and RELIABLE RELAMPING, INC., | ) | The Honorable |
| | ) | Daniel P. Duffy, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

*HELD*: Where employee knowingly violated employer's attendance policy multiple times, Board's determination that his actions constituted misconduct and rendered him ineligible for unemployment benefits was not clearly erroneous.

¶ 1 Plaintiff-appellant Shaunce Carroll (plaintiff) appeals, *pro se*, from a trial court order affirming defendant-appellee Illinois Department of Employment Security Board of

Review's (Board) final administrative decision finding him ineligible for unemployment benefits under section 602(A) of the Illinois Unemployment Insurance Act (Act) (820 ILCS 405/602(A) (West 2024)), following termination of his employment with defendant-appellee Reliable Relamping, Inc. (Reliable)[1] due to misconduct. On appeal, plaintiff contends that the Board's determination was improper because his actions were "not deliberate" and did not cause Reliable any harm. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3       Plaintiff began full-time employment with Reliable in early October 2023 as a light installer. Reliable terminated his employment in mid-November 2023. When plaintiff filed a claim for unemployment benefits with defendant-appellee the Illinois Department of Employment Security (Department), Reliable, via its Human Resources Manager Heath Hedden, filed a formal protest. Hedden outlined that plaintiff failed to appear for work and failed to call his supervisor to notify him of his absence; that he did this on three separate occasions; and that this violated Reliable's attendance (no-call, no-show) policy of which plaintiff was aware at the time of his hire. Hedden provided the Department with various documents including Reliable's employee handbook, which states in relevant part:

"A.    Attendance

         All employees are expected to arrive on time, ready to work, every day they are scheduled to work. If unable to arrive at work on time, or if an employee will be absent for an entire day, the employee must contact the supervisor as soon as possible. ***

_____

[1] Reliable did not file a brief in this appeal.

> Excessive absenteeism or tardiness will result in discipline up to and including termination. Failure to show up or call in for a scheduled shift without prior approval may result in termination."

Hedden also attached plaintiff's signed acknowledgement and receipt of Reliable's employee handbook containing this policy, dated prior to his employment. In addition, Hedden provided documents chronicling plaintiff's infractions. These included:

- a Disciplinary Action Notice issued to plaintiff by a supervisor on October 11, 2023 for a no-call, no-show violation having taken place the day before (October 10) and documenting that plaintiff received a verbal warning; the Notice was accompanied by an email also dated October 11, 1023 from a supervisor to Reliable's human resources department reporting that plaintiff did not call or show up for work;

- a second Disciplinary Action Notice issued to plaintiff by a supervisor on October 19, 2023 for another no-call, no-show violation having taken place that day and documenting that plaintiff received a final warning and was advised that another instance "could lead to suspension or termination;" the Notice was accompanied by an email dated October 20, 2023 from a supervisor to Reliable's human resources department reporting that plaintiff had now "missed 2 days no call no show;" and

- a third Disciplinary Action Notice issued to plaintiff by a supervisor on November 13, 2023 for a third no-call, no-show violation having taken place that day and documenting that plaintiff received a "dismissal;" the Notice was accompanied by an email dated November 15, 2023 from a supervisor to Reliable's human resources department and to

Hedden stating that plaintiff had now received "3 write ups for no call no show in 30 days."

Finally, Hedden included a Separation Form issued to plaintiff from Reliable noting the termination of his employment due to his violations of Reliable's attendance policy and stating that he would not be eligible for rehire.

¶ 4    A Department claims adjudicator was assigned to plaintiff's claim. In the Department's requested "Misconduct Questionnaire," as completed by plaintiff, he acknowledged in writing that he had been "fired" for three instances of "tardiness" by his supervisors. He further admitted that his conduct was in violation of Reliable's company policy, he had received prior warnings about his absenteeism, and he was aware he could be discharged for his noncompliance and failure to remedy his actions.

¶ 5    After considering the questionnaire and the documents presented by Hedden, the adjudicator found that the evidence demonstrated Reliable had terminated plaintiff's employment because he "no called[,] no showed 3 different times during his 42 days of employment," without ever providing an explanation, in violation of Reliable's attendance policy. Further reasoning that his discharge "was within [his] control to avoid," the adjudicator concluded plaintiff "was discharged for misconduct connected with the work" and denied his claim, finding him ineligible for unemployment benefits.

¶ 6    Plaintiff filed a Request for Reconsideration, stating he "disagree[d] with [the] decision." He explained that the work project at issue was in Ohio, where he and the rest of the crew were staying in a hotel. According to plaintiff, "the reason why [he] was late/no call no show is because at the hotel the formeman would leave at the hotel the first day I didn't worked

4

cause they didn't comunicate. \*\*\* They never knocke on my hotel door and say were working today [*sic*]." He also stated that he "was sexually harrod by my forman on ONE ocasioan [*sic*]." He concluded that his discharge was "Discrimitorion on thir behalf [*sic*]."

¶ 7    The matter proceeded before a Department referee/administrative law judge (ALJ), who conducted an evidentiary hearing via telephone at which plaintiff and Hedden appeared. Hedden testified that plaintiff was discharged because he neither appeared for work nor called his supervisor to explain his absence on three different occasions (October 10 and 19, and November 13, 2023), in violation of Reliable's attendance policy. Hedden confirmed that plaintiff had been provided with a written copy of that policy and had signed off on its receipt before employment. He also confirmed that on the three days in question, Reliable had work available for plaintiff but he never appeared, nor has he ever provided a reason or excuse for any of his absences.[2] Finally, when asked if there was anything else Hedden wanted to add, he responded that plaintiff's failure to appear "was something where we have to have people to work because we're on a timeline for things."

¶ 8    For his part, plaintiff admitted he was discharged following a verbal warning and multiple "write-ups." He testified that the "reason" for the discharge was that he "was late three times" and that he "didn't show" for work. He further acknowledged that he was aware Reliable had an attendance policy for its workers, and he admitted he had received its handbook containing that policy upon his employment. He testified that while he knew

---

[2] The referee also asked Hedden if there were any "other issues" that led to plaintiff's discharge. Hedden noted that plaintiff's manager "had some performance issues with him," and a fourth Disciplinary Action Notice dated in November 2023 provided to the referee (and included in the record here) detailed performance concerns on the jobsite. However, and as Hedden made clear to the referee, plaintiff's discharge was based only on his failures to appear for work.

about the policy, he did not believe it applied to him because he was working on a project "out of town" in Ohio while staying at a hotel with the crew and managers, and "we weren't at our houses showing up to work at a place."

¶ 9    Upon questioning by the ALJ, plaintiff testified about his three violations. As to the first, he recounted that he arrived to the project site in Ohio and, as directed, joined the group text to receive notifications as to when to appear for work. The next morning, he "waited" and watched his roommate check his phone, get ready, leave their room, enter the work van, and return eight hours later. When the ALJ asked plaintiff if he had a cell phone and if he tried to contact anyone, he admitted he had a phone, stated it "had some type of bad reception," and recounted only that a superior later told him no one was going to "babysit nobody." Plaintiff told the ALJ he felt there "was like no team support." With respect to his second violation, plaintiff testified "[i]t was the same thing," with his supervisors and fellow crewmembers "leaving [him] at the hotel." He repeated that "they would not knock on [his] door" in the mornings, but admitted he did receive "messages in [his] phone." He further averred that "[t]his was a whole thing to get [him] fired," with the crew and managers playing "the game" and "want[ing] *** some evil stuff for [him]." As for the third instance, plaintiff testified, without any other details, that he again missed work and the following morning was told to stay at the hotel because he would be receiving a call from his supervisor. He received that call, and his supervisor explained he had three "no call no shows," which was against policy and merited discharge. Plaintiff testified he believed his managers and coworkers "set me up pretty much for me to lose." At the end of his testimony, when asked by the ALJ if he had anything else to add, plaintiff briefly commented he "had to, uh, file a sexual harassment, uh,

complaint" with "OSHA" against Reliable because his supervisor had made "sexually, uh, derogatory comments" towards him one day. He did not provide any details regarding the alleged incident, other than that he filed the complaint several weeks after his discharge. In rebuttal, Hedden testified he never received any notification or information from plaintiff or any agency about a sexual harassment complaint.

¶ 10    Following the hearing's conclusion, the ALJ issued a written decision denying plaintiff's claim for unemployment benefits. Noting that Reliable had a written attendance policy plaintiff admitted he received and knew about, and Reliable repeatedly warned plaintiff about his infractions and their potential consequence of discharge, the ALJ found that plaintiff's termination from employment was the result of "misconduct" as defined in section 602(A) of the Act, as his conduct was a deliberate and willful violation of a reasonable rule and that his violation harmed Reliable. The ALJ's decision declared that plaintiff was "not eligible for benefits," and, accordingly, affirmed the adjudicator's determination.

¶ 11    Plaintiff appealed to the Board, stating that he "strongl[y] disagree[d]" with the ALJ's decision because he "was racially profile[d]" in "a case of discrimination." The Board affirmed. In its written decision, the Board detailed the evidence presented, including the circumstances of each of the three instances of plaintiff's attendance violations, as well as Reliable's attendance policy and the provisions of section 602(A). Finding that Reliable's policy made clear that excessive absenteeism would result in termination, that he received the policy when hired, and that he committed repeated violations of failing to appear for work and failing to call his supervisor after being warned multiple times, the Board concluded

plaintiff "was discharged for misconduct connected with work under the provisions of section 602(A) and is disqualified from benefits."

¶ 12        Thereafter, plaintiff filed a complaint in the circuit court seeking review of the Board's decision.  Following a hearing,[3] the court affirmed the Board's decision, finding it "not to have been clearly erroneous."  Plaintiff has appealed to our Court.

¶ 13                                          ANALYSIS

¶ 14        As a threshold matter, we note that compliance with Illinois Supreme Court Rule (Rule) 341(h) (eff. Oct. 1, 2020) is mandatory, and a party's status as a *pro se* litigant does not relieve him of noncompliance with appellate practice rules.  See *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8 (compliance with rules governing briefs on appeal is compulsory regardless of a party's status); accord *Ryan v. Katz*, 234 Ill. App. 3d 536, 537 (1992); see also *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57 (our supreme court rules, including Rule 341, are not merely advisory suggestions; rather, they are required to be followed).  The components of Rule 341(h) require that an appellant's brief contain, in addition to a Points and Authorities section and proper jurisdictional statement, a statement of "the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal."  Ill. S. Ct. R. 341(h)(1), (4), (6) (eff. Oct. 1, 2020).  Moreover, the necessary Argument section "shall contain the contentions of the appellant and the reasons therefore, with citation of the authorities and the pages of the record relied on," and "reference shall be made to the pages

_____

[3] While a transcript of this hearing is not included in the record, the trial court's written order states a hearing took place with both parties present.

of the record on appeal where evidence may be found." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). And, an Appendix is required (see Ill. S. Ct. R. 341(h)(9) (eff. Oct. 1, 2020)), comprising "a complete table of contents, with page references, of the record on appeal" stating the nature of each document therein, the date of filing, and the name of all witnesses and the pages of their examinations (Ill. S. Ct. R. 342 (eff. Oct. 1, 2019)). Where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal. See *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12; *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (citing *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23 (failure to follow Rule 341 may result in forfeiture of consideration of issues on appeal)).

¶ 15 Here, plaintiff's brief significantly fails to comply with Rule 341(h) in several important respects. It does not contain a Points and Authorities section or a viable Statement of Jurisdiction, there is not a single citation to the record on appeal anywhere, the Statement of Facts can hardly be said to be accurately and fairly stated without argument or comment, and there is no Appendix, as required. Moreover, save for one general citation each to the Act, the Illinois Human Rights Act, section 2-615 of the Illinois Code of Civil Procedure, and something he calls "Section 1900," plaintiff's brief provides no viable legal argument, let alone any relevant citation to legal authority. Thus, it is within our prerogative to strike his brief and dismiss this appeal based on his failure to comply with the applicable rules of appellate procedure. See *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80; accord *Petrik*, 2012 IL App (2d) 110495, ¶ 38 (reviewing court has every right to strike brief and dismiss appeal when Rule 341 violations impede review).

¶ 16        Nevertheless, because plaintiff made an effort to present his appeal by use of the approved form brief, because it is clear from his brief that he challenges the Board's final decision, and because we have the benefit of the Department's cogent brief in response, we choose not to dismiss this appeal. Rather, as the issues are evident and the merits can be readily ascertained from the record, we proceed with our analysis. See *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 511 (2011); accord *Fryzel v. Miller,* 2014 IL App (1st) 120597, ¶ 26 (despite deficiencies in brief, we may consider merits of appeal for purpose of settling issue in dispute).

¶ 17        On appeal, plaintiff contends that the Board's decision finding him ineligible for unemployment benefits was improper. Reiterating that he had a "cheap" cell phone, no car, and that his coworkers would not alert him to get ready for work in the mornings, he asserts his violations of Reliable's attendance policy, which he admits he clearly knew at the time of his employment, were "not deliberate" or harmful to Reliable and, thus, could not constitute "misconduct" under section 602(A) because his actions constituted only a "good faith error in jud[g]ment" and his failures to appear for work were "out [of his] control." He further asserts that his discharge was based on racial discrimination, sexual harassment, and he makes a passing mention of suffering from mental illness.

¶ 18        Upon review of a decision denying unemployment insurance benefits, we review the decision of the Board, and not the decision of the trial court. See *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22. The Board's findings and conclusion with respect to the facts presented are considered to be *prima facie* true and correct. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992);

*O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 653 (1983) (the agency is "charged with the primary responsibility of adjudication in [its] specialized area"); see also *Caliendo v. Martin*, 250 Ill. App. 3d 409, 416 (1993); *Stein v. Department of Employment Security*, 2017 IL App (3d) 160335, ¶ 17. Accordingly, we may not reweigh the evidence, make any independent determinations of fact, substitute our judgment for that of the Board with respect to the facts, reassess witness credibility, or resolve conflicting evidence; we may not reverse any of the Board's factual findings unless they are against the manifest weight of the evidence. See *Abrahamson*, 153 Ill. 2d at 88; *Caliendo*, 250 Ill. App. 3d at 416; see also *Williams v. Department of Employment Security*, 2016 IL App (1st) 142376, ¶ 53 (citing *Woods v. Illinois Department of Employment Security*, 2012 IL App (1st) 101639, ¶ 16).

¶ 19    More specifically, in the instant cause, because our review of the Board's decision requires us to determine the legal effect of a particular fact scenario, namely, whether plaintiff committed misconduct connected with his work by violating Reliable's attendance policy in that he failed to appear for work on three occasions without informing his supervisors, this appeal involves a mixed question of law and fact. See *Petrovic*, 2016 IL 118562, ¶ 21 ("[o]ur review of the Board's decision to deny unemployment insurance benefits based on an employee's discharge for misconduct involves a mixed question of law and fact"); accord *Williams*, 2016 IL App (1st) 142376, ¶ 56 (whether employee was properly terminated for misconduct in connection with work is a mixed question of law and fact). Mixed questions of law and fact are reviewed under a clearly erroneous standard. See *Petrovic*, 2016 IL 118562, ¶ 21; accord *Stein*, 2017 IL App (3d) 160335, ¶ 17. Ultimately, the Board's decision is considered to be clearly erroneous only when, based on the entire

record, a reviewing court is left with the definite and firm conviction that a mistake has been committed. See *Petrovic*, 2016 IL 118562, ¶ 21; accord *Stein*, 2017 IL App (3d) 160335, ¶17; *Williams*, 2016 IL App (1st) 142376, ¶ 56.

¶ 20 Here, the Board was required to review the evidence presented, to weigh the credibility of the witnesses (namely, plaintiff and Hedden), and to resolve any conflicts before it. The Board was then required to determine whether that evidence qualified as misconduct as defined under section 602(A) of the Act. Therefore, we review the Board's decision in this case for clear error. We find none.

¶ 21 First, we examine the Board's factual findings to determine if they were against the manifest weight of the evidence. This occurs only if the opposite conclusion is clearly evident. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008) (citing *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998)). Here, after reviewing the evidence presented, the Board determined that plaintiff deliberately violated Reliable's attendance, or no-call no-show, policy on three occasions after having received multiple warnings that said violations could result in his discharge. The record reflects that Reliable presented plaintiff with its attendance policy, as contained in its employee handbook, at the time of his hire and that plaintiff signed an acknowledgement of its receipt. The policy makes clear that all employees "are expected to arrive on time, ready to work" and if they are unable to do so, they "must contact the supervisor as soon as possible." The policy also explicitly states that the "[f]ailure to show up or call in for a scheduled shift without prior approval may result in termination."

¶ 22 The record further reflects that plaintiff violated the policy three times while employed with Reliable. The first instance was on October 10, 2023, when he did not report to work and did not call his supervisor. His supervisor issued a disciplinary action notice the next day stating it was for a no-call, no-show violation and noting that plaintiff was given a verbal warning; his supervisor also sent an accompanying email documenting the incident and the warning to human resources. The second instance took place soon after, on October 19, 2023. Again, plaintiff did not call his supervisor and did not show up for work. His supervisor issued a second disciplinary action notice that day, stating it was for a second no-call, no-show violation and noting that plaintiff was this time given a final warning and was advised that another violation "could lead to suspension or termination." Just as before, plaintiff's supervisor sent an accompanying email documenting the incident to human resources. Despite the warnings, a third instance followed on November 13, 2023, where plaintiff again failed to appear for work and again failed to inform his supervisor of his absence. His supervisor issued a third disciplinary action notice to plaintiff, this time documenting that he was receiving a "dismissal" from his employment for a third violation of the no-call, no-show policy. Again, the supervisor sent an email to human resources, and manager Hedden specifically, documenting the third violation.

¶ 23 For his part, plaintiff has never contended, nor even suggested, that he did not violate Reliable's attendance policy. In fact, he has consistently, and outrightly, throughout every step of this litigation, admitted he committed each of the documented violations. That is, he stated in the Department's Misconduct Questionnaire, which he filled out at the outset of his challenge to his discharge, that he was "fired" for three instances of "tardiness" as

13

documented by his supervisors. He further stated that he knew his conduct of failing to appear for work and failing to inform his supervisors was in violation of Reliable's attendance policy, he confirmed he had received multiple prior warning from his supervisors for no-call, no-show violations before the last incident, and he admitted he was aware at the time that he could be discharged if he continued to violate the policy. Additionally, plaintiff admitted all this again in his testimony before the ALJ. During that hearing, the ALJ asked him to speak to each of the three instances at issue. Plaintiff recounted that, as to the first, he "waited" on the morning of October 10, 2023, and watched as his roommate (a fellow crewmember) checked his phone, got ready for work and left their room. He also watched him enter the work van and not return for the next eight hours. Plaintiff admitted he did not attempt to report to work, and although he had a cell phone, he did not bother to contact his supervisor or anyone else that day. Likewise, he testified that "the same thing" happened with respect to the second incident; he admitted he received a text message from his supervisor that he was to report for work that morning, but he did not show up and did not work that day. And, per his testimony, the third incident was a repeat of the first two. Plaintiff further described that after the crew returned from work that day, he was told that he would be receiving a call from his supervisor the following morning. He received that call and was informed that his three "no call no shows" merited his discharge.

¶ 24    Although admitting his three violations, plaintiff repeatedly insisted they were attributable to his managers and fellow crewmembers. For example, he lamented that the managers "played a game" to "traumatize[]" him by telling him to be ready for work in the morning and that he was needed at the jobsite, but then would leave him "just sitting there"

14

in the hotel for the day. However, this characterization is not supported by the record, and is directly contradicted by plaintiff's own admissions; plaintiff has never once recounted an incident where he was ready and reported for work but was then told he was not needed and could remain at the hotel. Also, plaintiff's insistence that he did not believe Reliable's attendance policy applied because he was on a crew working out-of-state, as well as his blame-shifting to other crewmembers and insinuations of deviousness on the part of managers, fall flat here. Nowhere does he cite to anything (a verbal instruction or part of the employee handbook) that would indicate Reliable's attendance policy was somehow not in effect because the project plaintiff was assigned to was in Ohio as opposed to Illinois. And, that his roommate did not wake him up, that no one knocked on his door in the mornings, and that he felt like there was "no team support," even if true, is irrelevant. Again, plaintiff repeatedly admitted that he had a cell phone from which he received notifications sent by his supervisors to show up for work, that he received these notifications, and that he did not obey these notifications on three occasions even after he had received warnings that his no-call, no-shows could result in the termination of his employment. Based upon our review of the evidence, the Board's factual findings that plaintiff violated Reliable's attendance policy can hardly be said to be against the manifest weight of the evidence.

¶ 25        Concomitantly, the Board determined that plaintiff's violations qualified as misconduct as defined in section 602(A) of the Act. We must now consider whether that was correct, which, as detailed earlier, we review for clear error. If an employee is discharged for misconduct, he is ineligible to receive unemployment benefits under the Act. See *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 826 (2009). The Act defines

15

"misconduct" as "the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit." 820 ILCS 405/602(A) (West 2024). Based on this statutory definition, our courts have made clear that three main requirements must be met in order to establish misconduct on the part of an employee within the context of the Act: there must be (1) a deliberate and willful violation by the employee (2) of a reasonable rule or policy of the employer (3) that harms the employer or other employees, or has been repeated by the former employee despite a warning or the employer's explicit instructions. See *Williams*, 2016 IL App (1st) 142376, ¶ 55 (citing *Woods*, 2012 IL App (1st) 101639, ¶ 19); *Baker v. Department of Employment Security*, 2014 IL App (1st) 123669, ¶ 15; accord *Petrovic*, 2016 IL 118562, ¶ 26. We find no error in the Board's conclusion that each of these elements was met in the instant cause.

¶ 26        First, on all fronts, the evidence shows plaintiff deliberately and willfully violated Reliable's attendance policy. Under the Act, conduct is deliberate and willful when it comprises " 'a conscious act made in violation of company rules, when the employee knows it is against the rules.' " *Petrovic*, 2016 IL 118562, ¶ 30 (quoting *Wrobel v. Department of Employment Security*, 344 Ill. App. 3d 533, 538 (2003)). Succinctly, as detailed earlier, Reliable provided plaintiff with a copy of its employee handbook before he began his employment. In that handbook, Reliable made clear to its employees that they were required to appear for work and if they could not, they were to inform their supervisors. Reliable also warned therein that the failure to do so could result in discharge. In his testimony before the

16

ALJ, plaintiff admitted he was well-aware of this policy from the moment he started working for Reliable, and his signed receipt of the handbook was submitted into evidence. He also admitted he was warned by his supervisors, following both his first and second infractions, that his "no-call, no-shows" violated the policy and would merit discharge if repeated. Again, documentary evidence of this was presented, via Reliable's disciplinary action notices and accompanying emails. Yet, plaintiff committed a third violation thereafter. Furthermore, plaintiff never provided any explanation to Reliable for his absences, let alone any that indicated they were for reasons other than his own doing. Upon his arrival in Ohio to begin the project Reliable assigned him to, plaintiff's supervisors told him to join the text chain for notifications of when to appear in the morning for work. Upon the ALJ's questioning, plaintiff confirmed he had a cell phone and that he received notifications that he was scheduled to appear for work. However, essentially claiming his supervisors and coworkers, without more, were out to get him, he admitted both that he simply did not get out of bed, get ready, and report to work and that he never called anyone at Reliable to report his absences. His own testimony demonstrated that rather than doing so, he just watched his crewmember-roommate get ready for work, leave, get into the work van and not return for eight hours during the first instance; he stayed at the hotel because no one knocked on his door in the morning of the second instance; and he provided no details regarding the third instance other than his claim that he likewise was not alerted to the crew's departure.

¶ 27    From all this, the Board was free to find that plaintiff's testimony was incredible, to the extent that he claimed he did not deliberately and willfully violate Reliable's attendance policy. And, obviously, the Board did not find plaintiff's testimony, and his explanations

17

attempting to blame-shift, to be credible as to this element of misconduct. The evidence clearly shows he deliberately and willfully violated the policy, and even more clearly, he unequivocally admitted to doing so while being aware of that policy.

¶ 28        Similarly, with respect to the second statutory element required for a finding of misconduct, the Board could certainly conclude that Reliable's attendance policy was reasonable within the meaning of the Act. An employer's policy is reasonable if it "concerns ' "standards of behavior which an employer has a right to expect" ' from an employee." See *Sudzus*, 393 Ill. App. 3d at 827 (quoting *Livingston v. Department of Employment Security*, 375 Ill. App. 3d 710, 716 (2007) (quoting *Bandemer v. Department of Employment Security*, 204 Ill. App. 3d 192, 195 (1990))). An employer's policy against repeated absenteeism from work without notification, such as Reliable's "no call, no show" policy in the instant cause, is more than reasonable. Needless to say, it concerns a standard of behavior Reliable has a right to expect from its employees: showing up for work as scheduled and calling a supervisor to report an absence. See *Selch v. Columbia Management*, 2012 IL App (1st) 111434, ¶ 43 ("[i]n Illinois, employers have a right to expect a certain standard of conduct from employees in matters directly concerning their employment"). And, significantly, our courts have consistently maintained the same. See *Nichols v. Department of Employment Security*, 218 Ill App. 3d 803, 811 (1991) (employee "cannot validly argue that rules prohibiting excessive absenteeism and tardiness are not reasonable under the Act"); see also *Wilson v. Department of Employment Security*, 196 Ill. App. 3d 711, 714 (1990) (employee's failure to telephone employer to report his absence constituted misconduct under the Act, as absenteeism policy was reasonable); *Bochenek v. Illinois Department of Employment*

18

*Security*, 169 Ill. App. 3d 507, 509 (1988) (employee's failure to improve absenteeism and tardiness constituted misconduct under the Act in violation of employer's reasonable policy).

¶ 29 Again, in the instant cause, Reliable presented evidence of its attendance policy and expectations, as stated in its employee handbook, which plaintiff acknowledged he received and testified he knew and understood. Reliable's policy states that all employees "are expected to arrive on time, ready to work" when scheduled, they "must contact the supervisor as soon as possible" if they will be absent, and a failure to show up or call, along with excessive absenteeism or tardiness, may result "in disciple up to and including termination." This policy provides the most fundamental tenants of employment and, thus, was reasonable.

¶ 30 Finally, the third statutory requirement of misconduct under the Act is that the violation must have either harmed the employer, or been repeated by the employee despite previous warnings. See *Williams*, 2016 IL App (1st) 142376, ¶ 55; *Manning v. Department of Employment Security*, 365 Ill. App. 3d 553, 557 (2006). Although only one of these standards must be met, in the instant cause, there was more than sufficient evidence for the Board to conclude that plaintiff's violations of Reliable's attendance policy met both of them. Initially, as to the standard regarding harm, we note that absences and tardiness always harm an employer because they "cause disruption to the general operations of any business." 56 Ill. Admin. Code 2840.25(b) (West 2026). Indeed, Hedden explicitly testified before the ALJ that plaintiff's failure to show up for work and failure to report he would be absent was a problem because "we have to have people to work because we're on a timeline for things."

¶ 31 More significantly, and as the Board specifically found, plaintiff's violation of Reliable's attendance policy was repeated despite previous warnings. We have already detailed the

19

evidence presented demonstrating that plaintiff violated the policy three times: he "no-called, no-showed" on October 10, 2023 and received a verbal warning the next day; he "no-called, no-showed" again on October 19, 2023 and received a final warning the same day explaining that another instance could lead to his discharge; and he "no-called, no-showed" a third time on November 13, 2023, and received a "dismissal" resulting in his discharge. During his testimony before the ALJ and at some points in his brief, plaintiff suggests Reliable gave him each of the three warnings on the same day. However, other portions of his brief contradict this and acknowledge he received the warnings separately (after each incident). Ultimately, other than his bare and equivocal assertion, he cites no evidence that he was not warned after each instance. To the contrary, the three warnings issued by plaintiff's supervisors as contained in the record before us, which were all accompanied by emails from those supervisors to the human resources department, clearly show they were issued to plaintiff, and reported to human resources, on the three operative, and different, dates on which plaintiff committed the violations.

¶ 32    Before we conclude our decision, we feel we must address one last item here. The overwhelming crux of plaintiff's argument on appeal is that his termination was improper, and he should receive unemployment benefits, because Reliable discharged him based on racial discrimination and a report he made of sexual harassment. Briefly, both assertions are irrelevant in a claim for unemployment benefits under the Act, as allegations of employment discrimination are to be made under the Illinois Human Rights Act (see 775 ILCS 5/7A-101, 5/7A-102(A)-(D) (West 2024)). Moreover, plaintiff does not come close to even asserting the requirements for establishing a *prima facie* case of discrimination, as would be his

20

burden. See, *e.g.*, *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, and *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, (1989). For example, he does assert he is a member of a protected class or that he was treated differently from similarly situated employees; we do not even know his race or the races of any other individuals involved in this case, and there is no evidence anywhere in this record that plaintiff ever made a claim of racial discrimination while employed at Reliable, or even before the ALJ, for that matter. With respect to sexual harassment, he made a brief mention before the ALJ that his "for[e]man" sexually harassed him on "ONE" occasion. However, he provided absolutely no details of the incident, other than to say that he made a report to "OSHA." However, he admitted he did so only several weeks after he was discharged from Reliable, he provided no proof of any report, and Hedden testified in direct contradistinction that, as Reliable's human resources manager, he never received any notification from any agency, including OSHA, that such a report was made.

¶ 33 In sum, the evidence here, including his own admissions, clearly bears out that plaintiff knew of Reliable's attendance policy, one that was more than reasonable; that he chose to violate that policy of his own accord; and that he repeated this violation multiple times despite previous warnings. Accordingly, the Board's decision to deny plaintiff unemployment benefits due to misconduct under section 602(A) of the Act was not clearly erroneous.

¶ 34                                    CONCLUSION

¶ 35 For all the foregoing reasons, we affirm the decision of the Board.

¶ 36 Affirmed.